**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION

FEB 1 1 2004

JAMES W. McCORMACK, CLERK
By:_____
                        DEP CLERK

JOHN W. WALKER                                                    **PLAINTIFF**

VS.                              CASE NO. 5:03 CV0120 WRW

THE CITY OF PINE BLUFF,
ARKANSAS, a public body corporate;
and TERRY WAYNE GRACE, in his
individual and official capacities                              **DEFENDANTS**

### DEFENDANTS' BRIEF IN SUPPORT OF
### MOTION FOR SUMMARY JUDGMENT

*Introduction and Factual Background*

On June 24, 1998, Pine Bluff Police Officer Terry Wayne Grace made a traffic stop on Missouri Street in Pine Bluff on a vehicle that had no license plates. There were four black males occupying that vehicle. Another officer, Stephanie Sheets (now Smith), stopped and served as back up for Officer Grace on the traffic stop.

The facts as stated by plaintiff John Walker are as follows: While the officers were conducting the traffic stop, Walker, who was driving in the area, stopped his van and got out in order to observe the traffic stop. Walker said that he had seen the officers "seemingly without purpose riding up and down the poor section of Missouri Street" and he just decided to stop and see what they were doing. Exhibit 1, Deposition of John Walker at p. 21. Walker said that he does not believe people should be unnecessarily put upon by law enforcement where they are defenseless and his curiosity in stopping to observe the traffic stop related to the defenselessness of the young men and the posturing of officers in arrest situations. Exhibit No. 1, at p. 27. Walker also stated that he was predisposed to inquire as to whether or not that pattern of police behavior was being played out again in front of him. *Id.* Walker said he thought the "kids would likely be arrested, possibly, if not

probably for a traffic offense" and he thought his presence and what happened there kept them from being arrested. Exhibit No.1 at p. 32.

Walker parked his van partly on the shoulder of the street and partly on the street. Exhibit No. 1 at p. 30. He walked near the traffic stop and folded his arms across his chest. Exhibit No. 1 at p. 37. Officer Sheets approached Walker and asked if she could help him. Exhibit No. 1 at p. 38. Walker stated, "I'm observing Pine Bluff's finest in action." *Id.* Walker said he smiled when he made this comment. Exhibit No. 1 at p. 39. Officer Grace's back was to Walker while Walker observed the traffic stop and talked with Officer Sheets. Exhibit No. 1 at p. 38.

Officer Sheets walked away from Walker and appeared to say something to Officer Grace. Exhibit No. 1 at p. 41. Officer Grace then turned his attention away from his traffic stop and turned to Walker and asked why he was there. *Id.* Walker sort of smiled and said, "I'm watching Pine Bluff's finest in action." *Id.* According to Walker, Officer Grace asked him who he was and Walker asked, "why, have I committed a crime?" *Id.*

Walker told Officer Grace, "[l]ook you have no reason for asking for this, but I'm going to give it to you, I'm a lawyer." Exhibit No. 1 at pp. 41-42. Walker got his driver's license out and handed it to Officer Grace. Walker said he told Officer Grace "not to put his hands on me because I would have to sue him." Exhibit No. 1 at p. 49.

According to Walker, Officer Grace then handcuffed Walker and placed him in the backseat of his patrol car while he completed the traffic stop. Officer Grace subsequently transported Walker to the Jefferson County Detention Center where Walker was charged with obstructing governmental operations, Ark. Code Ann. § 5-54-102. Walker was fingerprinted and a mug shot was taken. He was later released on bail. The City subsequently dismissed the charges against Walker after Officer

Grace was arrested on unrelated felony charges. The decision to dismiss the charges was not a reflection on the merits of the charges. See Affidavit of John Snyder, Assistant City Attorney, Exhibit No. 6.[1]

Officer Stephanie Sheets Smith testified at her deposition that when Walker got out of his car, he had his arms folded and he looked upset to her. She knew he was irate. Exhibit No. 2, Deposition of Stephanie Sheets Smith at p. 23. Sheets testified that Walker was somewhere from 10 to 15 feet from the traffic stop. Exhibit No. 2 at p. 24. She did not know what his intentions were. Exhibit No. 2 at p. 25. Sheets said that Walker appeared to be frustrated (p.25) and that he looked aggressive to her. Exhibit No. 2 at p. 26.

Officer Sheets said that she could not focus on watching her partner (Grace) and watching Walker at the same time. She described Walker as confrontational and his attitude concerned her (p. 26) because she thought it was a threat. (pp. 27-28). Officer Sheets explained she had learned in training that if people have an attitude and their arms are crossed and they make you feel threatened, you should watch them for your safety. Exhibit No. 2 at p. 28.

Officer Sheets testified that Walker was interfering with the traffic stop (governmental operations) because he was taking her attention away from the scene, making her split her time between him and her fellow officer who had four individuals stopped. Exhibit No. 2 at p. 38.

---

[1]

The facts recited thus far are taken directly from the deposition of Plaintiff John Walker. Additional facts from the depositions of Terry Wayne Grace and Stephanie Sheets Smith are included to permit the Court to understand the situation from the viewpoint of the officers on the scene. Additionally, the statements of two of the occupants from the vehicle involved in the traffic stop are consistent with the officers' version of events. See Exhibit No. 4, Witness Statement of Antonio Sykes and Exhibit No. 5, Witness Statement of Chris Kitchens.

Officer Sheets said that Walker was interfering because she couldn't do what she was supposed to do, *i.e.,* back-up Officer Grace. Exhibit No. 2 at p. 66.

Officer Grace testified that Walker was hindering him in his official duties of trying to conduct a traffic stop, by his demeanor, his attitude and stance, by stepping back and forth and by speaking loudly.[2] Exhibit No. 3, Deposition of Terry Wayne Grace at p. 12. Officer Grace said that Walker was in the space of the traffic stop and was thereby causing a threat to the safety of the officers and the bystanders. Exhibit No. 3 at p. 14. Officer Grace said he did not know what Walker was capable of doing and that he could not conduct his traffic stop with his back to Walker. *Id.* Officer Grace stated that he arrested Walker because Walker would not cooperate. "For his safety and my safety and the officer's safety and the people at the scene, yes, he was going to be arrested and taken out of the equation." Exhibit No. 3 at p. 29.

Walker filed his civil rights lawsuit on July 10, 2000. He voluntarily dismissed that lawsuit on April 15, 2002. Walker refiled his civil rights lawsuit on March 27, 2003. On or about January 2, 2004, Walker amended his lawsuit to add Terry Wayne Grace, in his individual capacity, as a defendant. Walker claims that Officer Grace's actions in searching, arresting, and detaining him violated his First, Fourth, and Fourteenth Amendment constitutional rights. Additionally, Walker alleges that the City of Pine Bluff (City) failed to properly train and supervise its officers, resulting in the alleged violation of Walker's constitutional rights. Finally, Walker claims that the City has a policy of engaging in racially selective and discriminatory behavior. Walker brings his claims

---

[2] Walker denies that he yelled or that he moved back and forth. These facts are given to provide the Court with the officer's viewpoint. Even if they are disputed, they are not material facts that would preclude summary judgment for the defendants.

under 42 U.S.C. § 1981 and § 1983. For the reasons set forth below, the defendants are entitled to summary judgment on Walker's claims.

### Summary Judgment Standard

Summary judgment is appropriate only when there is no genuine issue of material fact, so that the dispute may be decided solely on legal grounds. *Holloway v. Lockhart*, 813 F.2d 874 (8th Cir. 1987); Fed.R.Civ.P. 56. The Supreme Court, in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986), established guidelines to assist trial courts in deciding whether this standard has been met:

> The inquiry is. . . whether there is a need for trial—whether, in other words, there are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

The Eighth Circuit Court of Appeals has cautioned that summary judgment should be used carefully, so that no person will be improperly deprived of a trial of disputed factual issues. *Inland Oil & Transport Co. v. United States*, 600 F.2d 725 (8th Cir. 1979). The Eighth Circuit set out the burden of the parties in connection with a summary judgment motion in *Counts v. M.K. Ferguson Co.*, 862 F.2d 1338 (8th Cir. 1988):

> [T]he burden on the moving party for summary judgment is only to demonstrate, *i.e.*, [to] point out to the District Court, that the record does not disclose a genuine dispute on a material fact. It is enough for the movant to bring up the fact that the record does not contain such an issue and to identify that part of th record which bears out his assertion. Once this is done, his burden is discharged, and, if the record in fact bears out the claim that no genuine dispute exists on any material fact, it is then the respondent's burden to set forth affirmative evidence, specific facts, showing that there is a genuine dispute on that issue. If the respondent fails to carry that burden, summary judgment should be granted.

*Id.* at 1339 (quoting *City of Mt. Pleasant v. Associated Elec. Coop.*, 838 F.2d 268, 273-74 (8th Cir. 1988) (citations omitted) (brackets in original). Only disputes over facts that may affect the outcome

of the suit under governing law will preclude the entry of summary judgment. *Anderson,* 477 U.S. at 248.

## ARGUMENT

### 1. Terry Wayne Grace, in his Individual Capacity, Is Entitled to the Defense of Qualified Immunity

Individual defendants are entitled to qualified immunity unless their alleged conduct violated "clearly established statutory or constitutional rights of which a reasonable person [in their positions] would have known." *Harlow v. Fitzgerald,* 457 U.S. 800 (1982). The law is clearly established if it gives the defendant official "fair warning" that his conduct violated an individual's rights when the official acted. *Hope v. Pelzer,* 536 U.S. 730, 739-40 (2002). Under the "objective reasonableness standard," courts are not to delve into the subjective motivation of the arresting officer. *Harlow,* 457 U.S. at 815-19.

In *Saucier v. Katz,* 533 U.S. 194, 201 (2001), the Supreme Court framed the threshold questions: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the [defendant's] conduct violated a constitutional right?" "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Id.* "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* An officer does not lose his qualified immunity because of a mistaken,

yet reasonable belief, nor does an officer lose his immunity because of a reasonable mistake as to the legality of his actions." *Id.* at 205-06.

To determine whether Grace is entitled to qualified immunity, the Court must first examine whether a reasonable officer in Grace's situation would have believed that his conduct was lawful. Grace was engaged in a traffic stop on a vehicle with no car tags.[3] The vehicle had four occupants and Grace had only one other officer serving as back-up. Walker entered the scene of the traffic stop and diverted the officers' attention away from the traffic stop. The officers now had to watch Walker, the occupants of the car engaged in the traffic stop, people coming out of their homes, and the occupants of Walker's van. Additionally, the officers described Walker as having his arms folded across his chest and being confrontational and aggressive. Walker stated he was watching "Pine Bluff's finest in action" and he threatened to sue Officer Grace if he touched him. The officers did not know who Walker was and they did not know what to expect from him. Under these circumstances, Grace was justified in his belief that he could arrest Walker for obstructing governmental operations.[4]

### Alleged Violations of Constitutional Rights

Walker contends that Grace violated his constitutional rights in the following manner:

---

[3]

Defendants realize that Walker contends that Grace was on personal business, *i.e.,* making arrangements to meet the occupants of the car at a later time. However, the objective evidence in this case bears out that the vehicle had no tags and that Grace gave the driver of the vehicle a warning ticket. Exhibit No. 7. Grace's subjective motivation for making the traffic stop, if any, is not to be considered by this Court. *Harlow v. Fitzgerald,* 457 U.S. 800, 815-19 (1982). This Court has already so ruled in two previous orders. Furthermore, it is the arrest of **Walker** that is at issue here, not the reason why Grace made the traffic stop. Therefore, any dispute of facts on this point is not material to the outcome of the case.

[4]

Officer Sheets also came to this same conclusion. Exhibit No. 2 at pp. 37-38.

- by searching him in the absence of reasonable suspicion in violation of the Fourth Amendment;

- by arresting him without probable cause in violation of the Fourth Amendment;

- by detaining, searching, and seizing him in a way that was racially selective and racially motivated in violation of the Equal Protection Clause of the Fourteenth Amendment;

- in detaining, searching, and seizing him in an area of town that was accessible to the public and at a safe distance from the traffic stop in violation of the First Amendment; and

- in detaining, searching, and seizing him in violation of the Due Process Clause of the Fourteenth Amendment.

### *Obstructing Governmental Operations*

In order for the Court to determine whether Officer Grace is entitled to qualified immunity, it must first examine the Arkansas statute for obstructing governmental operations.[5] Then, it must decide if the law was clearly established on June 24, 1998 and, if so, whether it would be clear to a reasonable officer that arresting Walker under this statute was unlawful in the situation Grace confronted. Arkansas law states that "a person commits the offense of obstructing governmental operations if the person knowingly obstructs, impairs, or hinders the performance of any governmental function." Ark. Code Ann. § 5-54-102(a)(1). "Governmental function" means any activity which a public servant is legally authorized to undertake on behalf of any governmental unit he serves. Ark. Code Ann. § 5-54-101(4).

---

[5]
Actually, the first step is for the Court to ask whether taken in the light most favorable to Walker, do the facts alleged show that Grace's conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The answer to this question is clearly "no." Under *Saucier*, no further inquiry is needed because Grace is entitled to qualified immunity. Defendants are merely setting forth a more detailed analysis beyond this initial inquiry because they anticipate that plaintiff will contend that his constitutional rights were violated by his arrest.

There are very few published cases on obstructing governmental operations to provide guidance to an officer as to what behavior constitutes this offense. One case is *Kelley v. State*, 75 Ark. App. 144, 55 S.W.3d 309 (2001).[6] In *Kelley*, the officers were engaged in a DWI traffic stop when Kelley came out of his home. Kelley interfered with the officers' ability to administer field sobriety tests to the driver and he also interfered with one officer's ability to provide security in the form of back-up for the other officer. The Arkansas Court of Appeals found that under these facts, there was sufficient evidence to support Kelley's conviction for obstructing governmental operations.

Another instructive case is *Gorra v. Hanson*, 880 F.2d 95 (8th Cir. 1989) (Minnesota law). In *Gorra*, Gorra's son had been involved in an automobile accident, but had left the scene. Gorra came to the scene to retrieve some personal property while the troopers were still there. Gorra denied that he knew where his son was. The troopers warned Gorra that if he was lying or withholding information, they would arrest him for obstruction of justice. When Gorra left, the troopers followed him and eventually found him with his son. The troopers arrested Gorra for obstruction of legal process under Minnesota law. That statute is similar to Arkansas's obstructing governmental operations statute. The charges were eventually dismissed at the request of the prosecutor, but not upon the ground that probable cause was lacking for the arrest.

Gorra filed a § 1983 claim alleging that he was arrested without probable cause. The Eighth Circuit found that the troopers were entitled to qualified immunity because at the time of the arrest, no court had defined the conduct that would violate the statute. In the absence of any judicial

---

[6] Obviously, this case had not been decided when the incident with Walker occurred in 1998. At that time, it appears that there were no published Arkansas cases in which the courts had specifically defined what conduct would violate the statute for obstructing governmental operations.

interpretation to the contrary, a reasonable officer could have concluded that lying about the whereabouts of a suspect constituted "obstructing" or "hindering." Because the law was not clearly established at the time of the arrest, and because the troopers' interpretation was not inconsistent with common understanding, the Court could not say that the troopers' interpretation of the statute was unreasonable.

*Crumley v. City of St. Paul,* 324 F.3d 1003 (8th Cir. 2003) (Minnesota law) is factually similar in some respects to the instant case. In *Crumley,* an officer had stopped a vehicle and placed the driver of the vehicle in the backseat of his patrol car. The officer then noticed Crumley, an attorney, watching him from across the street. Crumley stated that she was merely observing the encounter. She watched for a short time, then left for about 10 minutes, but later returned to the traffic stop. While the officer conducted a warrant search on the driver of the vehicle, Crumley approached the driver (seated in the police car) and handed him her attorney business card. The officer told Crumley to get away from his traffic stop. He struck or pushed her several times, then spun her around and handcuffed her. Crumley was charged with obstruction of legal process in violation of Minnesota law. A jury later found her not guilty.

Crumley brought a § 1983 action against the officer based on alleged Fourth Amendment violations. The Eighth Circuit found that there was probable cause for her arrest and that she was collaterally estopped from raising this issue because it had been litigated in state court. The Eighth Circuit also rejected her Fourth Amendment excessive force claim because her injuries were too minor.[7]

---

[7]

Walker does not raise an excessive force claim under the Fourth Amendment. If he did, it would be clear under the facts of *Crumley* that such a claim would fail.

10

In June 1998, when Grace arrested Walker, there appear to have been no published judicial opinions interpreting the Arkansas statute for obstructing governmental operations. Therefore, it was reasonable for Officer Grace to conclude that Walker's actions at the traffic stop hindered Grace's ability to conduct the traffic stop and thus, violated the statute for obstructing governmental operations. The law was not clearly established at the time of Walker's arrest and Grace's interpretation of the statute is consistent with common understanding. Even if Grace had been mistaken that Walker's conduct violated the statute, an officer does not lose his qualified immunity because of a mistaken, yet reasonable belief. *Saucier,* 533 U.S. at 205-06. Grace is entitled to the defense of qualified immunity and summary judgment should be entered in favor of Grace, in his individual capacity.

### 2. Specific Constitutional Rights

Although Grace is entitled to qualified immunity because the facts alleged do not show that Grace violated Walker's constitutional rights, the defendants will nonetheless examine and brief each of the constitutional rights that Walker alleges Grace violated.

### Fourth Amendment

Walker alleges that he was searched and arrested in violation of the Fourth Amendment. A person has a clearly established right under the Fourth Amendment not to be arrested unless there is probable cause for his arrest. In the context of deciding whether the law enforcement officer is entitled to qualified immunity, the issue "is not probable cause in fact, but arguable probable cause." *Myers v. Morris,* 810 F.2d 1437, 1455 (8th Cir. 1986). The question for immunity purposes thus becomes "whether the officer should have known that the arrest violated plaintiff's clearly established right. *Habiger v. City of Fargo,* 80 F.3d 289, 295 (8th Cir. 1996). The qualified

immunity defense protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 342 (1986).

Probable cause is to be determined upon the objective facts available to the officers at the time of the arrest. *Smithson v. Aldrich*, 235 F.3d 1058 (8th Cir. 2000). At the time of Walker's arrest, Officer Grace had, at least, arguable probable cause to conclude that Walker was interfering with governmental operations, *i.e.*, the traffic stop. Even if this was a mistaken belief, Grace is still entitled to a qualified immunity defense. *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

"It is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials–like other officials who act in ways they reasonably believe to be lawful–should not be held personally liable." *Greiner v. City of Champlin*, 27 F.3d 1346 (8th Cir. 1994) quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1982). Grace reasonably concluded he had probable cause to arrest Walker on the charge of obstructing governmental operations. Accordingly, he is entitled to the defense of qualified immunity.

### *Fourteenth Amendment*

Walker claims that Grace's actions in detaining, searching, and seizing him were racially selective and racially motivated in violation of the Equal Protection Clause of the Fourteenth Amendment. Walker also contends that Grace's actions in detaining, searching, and seizing him were in violation of the Due Process Clause of the Fourteenth Amendment. (Amended Complaint at ¶ 17 (c) and (e)).

Walker is essentially claiming that the practices of the City and the arresting officer resulted in the unequal enforcement of the statute for obstructing governmental operations. To succeed on

a selective prosecution claim, a plaintiff "must show both that the enforcement had a discriminatory effect, and that the enforcement was motivated by a discriminatory purpose." *Jefferson v. City of Omaha,* 335 F.3d 804, 807 (8th Cir. 2003) quoting *United States v. Bell,* 86 F.3d 820, 823 (8th Cir. 1996).

In his Amended Complaint, at ¶ 13, plaintiff alleges that while at the jail (Jefferson County Detention Center)[8] he "looked through a large book, unidentified to this day, which apparently belonged to the jailer. This book contained entries of arrests made by local law enforcement. In it Plaintiff saw what he believed to be a disproportionately large number of arrests of blacks for what he deemed 'insubordination' offenses, such as disorderly conduct, resisting arrest, obstruction of governmental operations, and the like. Every prisoner he saw that day was African American."

In *United States v. Parham,* 16 F.3d 844 (8th Cir. 1994), the Court set out the elements of a *prima facie* case of selective prosecution: (1) that he has been singled out for prosecution while others similarly situated have not been prosecuted for similar conduct and (2) that the government's action in thus singling him out was based on an impermissible motive such as race, religion, or the exercise of constitutional rights. *Id.* quoting *United States v. Matter,* 818 F.2d 653, 654 (8th Cir. 1987). The Eighth Circuit said that the burden is a heavy one and requires a showing of intentional and purposeful discrimination. *Id.* at 654-55. Absent this *prima facie* showing, the prosecution is presumed to have been undertaken in good faith. *Id.* at 655.

---

[8]

Pine Bluff does not have a city jail. It transports it prisoners to Jefferson County Detention Center, a regional facility that houses prisoners from throughout Jefferson County as well as prisoners from other locations taken on a contract basis. Any "book" which Walker alleges he saw while in "jail" was the property of the Jefferson County Detention Center, not the City of Pine Bluff and would have contained information on arrests other than those made by Pine Bluff police officers.

In order to establish a discriminatory effect, Walker must show that the law he was cited under was not enforced with the same vigor against persons of a different race. He must offer evidence as to the enforcement of the specific statute. See *Jefferson v. City of Omaha,* 335 F.3d at 807. Generic evidence of the percentage of black population arrested and the percentage of black population in general, standing alone, does not indicate a discriminatory effect in arrests generally and it certainly does not indicate a discriminatory effect with respect to the specific statute at issue in this case. *Id.*

In a race case, plaintiffs must show that similarly situated individuals of a different race were not subjected to the challenged conduct. *Chavez v. Illinois State Police,* 27 F. Supp.2d 1053 (N.D. Ill. 1998) *aff'd* 251 F.3d 612 (7th Cir. 2001) citing *United States v. Armstrong,* 517 U.S. 456, 116 S. Ct. at 1487-89 (1996). Statistical evidence showing that all defendants prosecuted during a certain year were African-American fails to satisfy this requirement. *Armstrong,* 116 S. Ct. at 1483, 1489.

Census figures for the City of Pine Bluff for the year 2000 reflect that 65.9% of the population of the City was black, while only 32 % of the population of the City was white. Asians, Hispanics, Latinos, and Mexicans comprised the remaining percentage of the population. Exhibit No. 8, Affidavit of Jerre George, Southeast Arkansas Regional Planning Commission. Given these numbers, one would likely expect that black citizens are arrested more often in Pine Bluff than white citizens, simply because black citizens comprise 2/3 of the City's population, while white citizens comprise just 1/3 of the City's population.

However, it is important to note that the Eighth Circuit has cautioned that generic evidence of the racial breakdown of a community is not sufficient to show a discriminatory effect in arrests. Walker has not provided the Court with any evidence that the law he was cited under was not

14

enforced with the same vigor against persons of a different race. *Jefferson v. City of Omaha*, 335 F.3d 804, 807 (8th Cir. 2003). The U.S. Supreme Court has held that a person in Walker's position must produce some evidence that similarly situated individuals of other races could have been prosecuted, but were not. *United States v. Armstrong*, 517 U.S. 456, 469 (1996).

Walker cannot produce any evidence that his detention, search, seizure, or arrest were racially selective. Walker has only speculation to support this claim. He is required to produce evidence and it must relate specifically to the statute for obstructing governmental operations. Walker's fourteenth amendment claim fails and Grace is entitled to qualified immunity on this claim.

### First Amendment

In ¶ 17(d) of his Amended Complaint, Walker alleges that "Grace's actions in detaining, searching, and seizing Plaintiff who was standing in an area of town accessible to the public and at a safe distance from the 'traffic stop' were in violation of the First Amendment to the federal constitution."

The First Amendment provides:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to the petition the Government for a redress of grievances.

Frankly, based on the limited allegation, defendants are unsure exactly which part of the First Amendment that Walker is claiming was violated. Defendants assume that Walker is referring to his constitutional right to assemble on a street or sidewalk. "Streets, sidewalks, parks, and other similar public places are so historically associated with the exercise of First Amendment rights that access to them for the purpose of exercising such rights cannot constitutionally be denied broadly

15

and absolutely." *Hudgens v. NLRB*, 424 U.S. 507, 515 (1976). Such public places are considered to be "public forums." *United States v. Grace*, 461 U.S. 171, 177 (1983).

Defendants do not dispute that Walker had a constitutional right to stand on the street (there are no sidewalks on Missouri Street). However, Walker did not have a right to hinder or obstruct the officers' traffic stop that was underway when he chose to stand on the street and observe the traffic stop. Without more information from plaintiff as to exactly how Walker's First Amendment rights were allegedly violated, defendants cannot properly address this claim, except to say that it would not have been obvious to a reasonable officer that it would be improper to arrest someone who was hindering, interfering with, or obstructing a governmental operation, regardless of his constitutional right to stand on a street. Grace is entitled to qualified immunity on this claim as well.

### 2. The City is Entitled to Summary Judgment on the Claims of Failure to Train and Supervise

In ¶ 19 of his Amended Complaint, Walker makes allegations against the City which can be summarized as follows:

- that it failed to train and adequately supervise its officers to refrain from engaging in racially selective and racially discriminatory encounters with African Americans;

- that it failed to train and supervise adequately its officers to refrain from turning against members of the populace who happen to observe casually and amiably the activities of the PBPD; and

- that the actions of Grace in detaining, searching, and arresting plaintiff were done pursuant to a governmental custom or policy of the City to promote, encourage, and facilitate the racially selective and racially discriminatory encounters with the African-American pubic.

Plaintiff has alleged that the City failed to take reasonable steps to train or supervise Officer Grace, and as a result, has engaged in a custom, practice, and usage which resulted in a violation of

plaintiff's constitutional rights.[9]  With respect to such an allegation, the law requires the plaintiff to prove: (1) the existence of a City policy, promulgated by the City's official policymaker, or of a practice "so permanent and well settled as to constitute a custom or usage with the force of law"; (2) that the policy is unconstitutional; and (3) that application of the policy caused any allegedly unconstitutional conduct by the police officers involved in the incident.  *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988); *Jane Doe "A" v. Special Sch. Dist.*, 901 F.2d 642, 646 (8th Cir. 1990).  "A successful suit requires the plaintiff to establish that he was injured, and that some municipal policy, custom, or practice proximately caused the injury."  *Polk County v. Dodson*, 454 U.S. 312, 326 (1981).

First, plaintiff's allegations against the City fail at the threshold with the absence of any underlying constitutional violation.  *Roe v. Humke*, 128 F.3d 1213, 1218 (8th Cir. 1997).  Absent an underlying constitutional violation, the City may not be held liable under § 1983.  *Los Angeles v. Heller*, 475 U.S. 796 (1986).  Where a § 1983 plaintiff seeks to hold a municipality liable based on its alleged inadequate training and supervision of its police officers, the plaintiff must first establish that the officer's actions were unlawful.  *Kiser v. City of Huron*, 219 F.3d 814 (8th Cir. 2000).  "The City cannot be liable . . .whether on a failure to train theory or a municipal custom or policy theory, unless [an officer] is found liable on the underlying substantive claim."  *Id.* quoting *Abbott v. City of Crocker*, 30 F.3d 994, 998 (8th Cir. 1994).

Even assuming a constitutional violation, the City may be held liable only if the municipal policy or custom is the moving force behind a constitutional violation.  *Monell v. Department of*

---

[9]

Plaintiff did not name any specific supervisor, such as the Chief of Police, as a defendant.  Instead, his claim appears to be against the City in general.

*Social Serv.* 436 U.S. 658, 694 (1978); *Wedemeier v. City of Ballwin,* 931 F.2d 24, 26 (8th Cir. 1991).

Liability may be imposed not only where the challenged conduct executes or implements a formally

adopted policy, but also where the conduct reflects practices of government officials "so permanent

and well settled as to constitute a 'custom or usage' with the force of law." *Monell,* 436 U.S. 691

(quoting *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 167-68 (1970); *see also Springdale Educ. Assn.*

*v. Springdale Sch. Dist.,* 133 F.3d 649, 651 (8th Cir. 1998).

The policy or custom requirement means that a municipality cannot be held vicariously liable

for its employees' unconstitutional acts. *Monell v. Dept. of Social Serv.,* 436 U.S. 658, 691 (1978);

*see also Springdale Educ. Assn.,* 133 F.3d at 651 (local government cannot be held liable under §

1983 on *respondeat superior* theory). An isolated violation by one who is not a final policy maker

is insufficient to establish a municipal policy or custom.[10] *See City of Oklahoma City v. Tuttle,* 471

U.S. 808, 823-34 (1985) (plurality); *Wedemeier,* 931 F.2d at 26. By the same token, a single

deviation from a written, official policy does not prove a conflicting custom or usage. *Wedemeier,*

931 F.2d 24 (8th Cir. 1991) quoting *Williams-El v. Johnson,* 872 F.2d 224, 230 (8th Cir. 1989).

The Eighth Circuit summarized the factors plaintiffs must show to establish the existence of

an unconstitutional governmental custom and practice, as follows:

   1)   The existence of a continuing, widespread, persistent pattern of unconstitutional
        misconduct by the governmental entity's employees;

   2)   Deliberate indifference to or tacit authorization of such conduct by the governmental
        entity's policymaking officials after notice to the officials of that misconduct; and

---

[10]
In his interrogatory responses, plaintiff lists several PBPD policies which he contends that Grace
violated. Exhibit No. 9, Plaintiff's Response to Interrogatory No. 9. Even if Grace deviated from
these official policies, which defendants deny, the mere listing of them does not prove a failure of
training or supervision against the City, nor does it prove that a constitutional injury occurred.

3)      That plaintiff was injured by acts pursuant to the governmental entity's custom, *i.e.*, that the custom was the moving force behind the constitutional violation.

*Ryan v. Board of Police Comm'rs.*, 96 F.3d 1076, 1084 (8th Cir. 1996) (citing *Jane Doe "A"*, 901 F.2d at 646); *see Harris v. City of Pagedale*, 821 F.2d 499, 504-07 (8th Cir. 1987).

The U.S. Supreme Court set forth the standard for imposing municipal liability in failure to train cases in *City of Canton v. Harris*, 489 U.S. 378 (1989). In *Canton*, the Supreme Court held that "the adequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Id.* at 388. Only where a municipality's failure to train evidences "deliberate indifference" to the rights of citizens can the shortcomings be properly thought of as a policy (a "deliberate" or "conscious" choice by the municipality) or custom that is actionable under § 1983. *Id.* at 389. In addition, the policy must be the moving force behind the constitutional violation. *Id.*

The Supreme Court defined "deliberate indifference" as:

> [I]n light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the City can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the City is responsible, and for which the City may be held liable if it actually causes injury.

*Canton v. Harris,* 489 U.S. 378, 390 (1989).

The Court provided an example of when a municipality can be held liable on a failure to train claim at 489 U.S. 390, fn. 10:

> [C]ity policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force can be said to be "so obvious" that

19

failure to do so could properly be characterized as "deliberate indifference" to constitutional rights.

A § 1983 plaintiff must show more than "but for" causation. According to *Canton,* it is not sufficient to show that the injury could have been avoided if an officer had had better or more training sufficient to equip him to avoid the particular injury-causing conduct. *Id.* at 391. After all, such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program. "And plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the City liable." *Id.* Finally, for municipal liability to attach, the identified deficiency in the city's training program must be closely related to the ultimate injury. *Id.* The Supreme Court said that to adopt lesser standards of fault and causation would open municipalities to unprecedented liability under § 1983. *Id.*

> In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city "could have done" to prevent the unfortunate incident. [internal citations omitted] Thus, permitting cases against cities for their "failure to train" employees to go forward under § 1983 on a lesser standard of fault would result in *de facto respondeat superior* liability on municipalities–a result we rejected in *Monell,* 436 U.S. at 693-94. It would also engage the federal courts in an endless exercise of second-guessing municipal employee training programs.

The Eighth Circuit has, of course, applied the *Canton* standards to failure to train claims. See *Abbott v. City of Crocker,* 30 F.3d 994 (8th Cir. 1994) and *Warren v. City of Lincoln,* 816 F.2d 1254 (8th Cir. 1987). In *Warren,* the Court said that "[i]f a municipality fails to train its police force or if it does so in a grossly negligent manner so that it inevitably results in police misconduct, the municipality may fairly be said to have authorized the violations. *Warren,* 816 F.2d at 1263. In this case, plaintiff's allegations fall far short of this standard.

To survive summary judgment, Walker must provide evidence that the City was on notice that its training procedures were inadequate and likely to result in violation of constitutional rights. *Thelma D. Ex rel. Delores A. V. Board of Educ.*, 934 F.2d 929, 934 (8th Cir. 1991). If on notice of the inadequacy, the City's failure to address it amounts to deliberate indifference. There are two ways that Walker may prove notice. First, he may show that the failure to train is so likely to result in a violation of constitutional rights that the need for training is patently obvious. *Id.* Second, he may show that a pattern of misconduct indicates that the City's responses to a regularly recurring situation are insufficient to protect the citizens' constitutional rights. *Id.* quoting *P.H. v. School Dist. of Kansas City*, 265 F.3d 653, 660 (8th Cir. 2001).

The Courts are concerned with the City's training policy, not how Officer Grace absorbed the training. *Larkin v. St. Louis Housing Authority*, __F.3d __, 2004 U.S. App. LEXIS 983 (January 23, 2004). "That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the [City], for the officer's shortcomings may have resulted from factors other than a faulty training program. It may be, for example, that an otherwise sound program has occasionally been negligently[11] administered." *City of Canton v. Harris*, 489 U.S. at 390-91. "The issue in a case like this one is whether the training program is adequate; and if it is not, the question becomes whether such inadequate training can justifiably be said to represent city policy." *Id.* at 390.

A failure to train officers may amount to a "policy," but this variety of claim generally requires the municipality to have prior notice of its officers' misbehavior and to act with deliberate

---

[11] Municipalities have tort immunity under Arkansas law, Ark. Code Ann. § 21-9-301. Therefore, it is unlikely that a claim of negligent supervision would ever be sufficient to impose liability against a city supervisor. Also, alleging mere negligence in supervision is insufficient to establish a constitutional violation. *Rubek v. Barnhart*, 814 F.2d 1283, 1284 (8th Cir. 1987).

21

indifference thereafter. *Audio Odyssey v. Brenton First Nat'l Bank,* 245 F.3d 721 (8th Cir. 2001) citing *Patzner v. Burkett,* 779 F.2d 1363, 1367 (8th Cir. 1985). Walker cites no evidence of previous First, Fourth, or Fourteenth Amendment violations by Pine Bluff police officers or by Grace, in particular, that resemble the alleged constitutional violations claimed by Walker. Nor has Walker produced any evidence that the City had notice of any such misconduct. A single occurrence of an alleged constitutional violation does not impose liability on the City for allegedly failing to train its officers. *Board of County Comm'rs v. Brown,* 520 U.S. 397, 409 (1997).

Furthermore, there were no previous complaints about Officer Grace regarding the type of misconduct that plaintiff alleges. Grace testified at his deposition that the only disciplinary action taken against him by the City was a reprimand for being involved in an accident in his police cruiser. Exhibit No. 3 at p. 9. Grace had only one citizen complaint, that he had failed to properly check an alarm at a building. However, an investigation proved that the complaint was unfounded. Exhibit No. 3 at p. 10.

Prior to Walker's arrest, no citizen had ever filed any complaint against Grace for mistreatment, abuse, or racially selective arrests.[12] Indeed, Grace had no record of mistreating black citizens in any way. The City, therefore, had no notice that Grace allegedly had the propensities that plaintiff alleges. The City cannot be found to be deliberately indifferent to the rights of citizens when there was no prior incident that would have placed the City on notice of the need for more or different training.

---

[12] Even Walker did not file a citizen complaint with the police department concerning Grace. Instead, he waited over two years before he even filed his lawsuit in federal court.

"To establish a City's liability based on its failure to prevent misconduct by its employees, the plaintiff must show the City officials had knowledge of prior incidents of police misconduct and deliberately failed to take remedial action." *Parrish v. Luckie,* 963 F.2d 201, 204 (8th Cir. 1992) quoting *Harris v. City of Pagedale,* 821 F.2d 499, 504 (8th Cir. 1987). The facts are clear that the City had no prior knowledge that Officer Grace had any alleged propensity to "abuse" black citizens. Indeed, the evidence is to the contrary. Accordingly, the City cannot be held liable for failure to prevent any alleged misconduct by Grace.

Plaintiff cannot withstand summary judgment by merely making allegations in his Amended Complaint that cannot be factually supported. At this stage of the proceedings, he cannot rest on the mere allegations of his complaint, but must set forth, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e).

Plaintiff simply cannot satisfy the elements necessary to state a claim for municipal liability under § 1983. He has no proof of widespread unconstitutional misconduct by police officers in Pine Bluff. Moreover, plaintiff can present no proof of deliberate indifference to or tacit authorization of this alleged unconstitutional misconduct by the policy making officials after notice of such conduct. As such, this claim against the City is without merit and summary judgment should be entered in favor of the City.

### 3. Official Capacity Claims Against Defendant Grace Should be Dismissed as Redundant As Plaintiff Has Sued the City of Pine Bluff

Plaintiff has sued Officer Terry Wayne Grace in his official, as well as his individual capacity. Moreover, plaintiff has sued the City of Pine Bluff. An "official capacity" lawsuit against a

governmental employee or official is synonymous with a suit against the entity itself.  Therefore, the official capacity claims against Grace are actually claims against the City.

In *Kentucky v. Graham*, 473 U.S. 159, 165 (1985), the Court, recognizing that the "distinction apparently continues to confuse lawyers," explained the difference between individual and official capacity lawsuits, stating:

> Personal-capacity suits seek to impose personal liability upon a governmental official for actions he takes under color of state law. *Official-capacity lawsuits, in contrast, "generally represent only another way of pleading an action against an entity of which an officer is an agent."*

*Id.* (emphasis added) (quoting *Monell v. Department of Social Serv.,* 436 U.S. 658, 690, n.55 (1978)). Thus, the Court explained, "[a]s long as the government entity receives notice and an opportunity to respond, an official-capacity lawsuit is, in all respects other than name, to be treated as a suit against the entity.  It is *not* a suit against the official personally, for the real party in interest is the entity." *Id.* at 166 (emphasis in original) (citing *Brandon v. Holt,* 469 U.S. 464, 471-72 (1985)).

Therefore, when a complaint names as defendants a municipality and a local officer in an official capacity, the claim against the officer is redundant and should be dismissed. *Union Railroad Company v. Village of South Barrington*, 958 F. Supp. 1285 (N.D. Ill. 1997); *Luke v. Abbott,* 954 F.Supp. 202 (C.D. Cal. 1997); *Vance v. Santa Clara,* 928 F.Supp 993 (N.D. Cal. 1996).  As such, the claims against Grace, in his official capacity should be dismissed as redundant.

## CONCLUSION

For the foregoing reasons and citations to authority, summary judgment should be entered in favor of defendants on all claims and plaintiff's Amended Complaint should be dismissed with prejudice in its entirety.

24

Respectfully submitted,

Carol Billings
City Attorney
200 East Eighth Avenue, Suite 203
Pine Bluff, AR 71601
(870) 543-1805

By: _____
Patricia J. Hays No. 90006
Attorney at Law
2300 Andover Court, Suite 560
Little Rock, AR 72227
(501) 801-8200 telephone
(501) 801-7430 facsimile

## CERTIFICATE OF SERVICE

I, Patricia J. Hays, hereby certify that a true and correct copy of the foregoing was mailed, postage prepaid, to Ted Boswell, Boswell, Tucker and Brewster, P.O. Box 798, Bryant, AR 72089-0798, on this 10ᵗʰ day of February, 2004.

_____
Patricia J. Hays

25