

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

FEB 23 2004

JAMES W. McCORMACK, CLERK
By:_____
                      DEP CLERK

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION

JOHN W. WALKER                                                                    PLAINTIFF

VS.                           CASE NO. 5:03 CV0120 WRW

THE CITY OF PINE BLUFF,
ARKANSAS, a public body corporate;
and TERRY WAYNE GRACE, in his
individual and official capacities                                      DEFENDANTS

### DEFENDANTS' BRIEF IN RESPONSE
### TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff has moved for summary judgment against the defendants on the issue of liability

because, according to the plaintiff, "it would be a tremendous waste of time and resources for the

case to go to the jury on the issue of liability" when "the real issue in dispute is the amount of

damages." (Plaintiff's brief at p. 3).[1] In other words, from plaintiff's perspective, the case is all about

money.

Plaintiff's motion completely misses the constitutional mark, indicating that the plaintiff

either has a fundamental misunderstanding of § 1983 law or else he does not believe the law applies

to him. Since the plaintiff himself is the most widely renowned civil rights lawyer in the state of

Arkansas, one has to assume that he, at the very least, is familiar with the law as it applies to actions

brought under § 1983. Given that fact, plaintiff surely knows that it is *arguable* probable cause, not

probable cause in fact, that is the standard for a determination of qualified immunity for Officer

Grace. *Myers v. Morris,* 810 F.2d 1437, 1455 (8th Cir. 1987). "The probability, and not a *prima*

---

[1]

Defendants also filed a motion for summary judgment on all issues at the same time that plaintiff
filed his motion. Because that brief discusses the legal theory in great detail, many of those
arguments will not be repeated here, but instead, the defendants will direct the Court to the legal
discussion already set forth in their own motion for summary judgment.

*facie* showing, of criminal activity is the standard of probable cause." *Smithson v. Aldrich*, 235 F.3d 1058, 1062 (8th Cir. 2000). Therefore, plaintiff's entire argument on the standard for probable cause sets forth the incorrect standard in the context of a § 1983 case.

Plaintiff does not state any reason in his motion or brief why liability should be imposed upon the City of Pine Bluff. Therefore, defendants are left to assume that plaintiff believes that liability can be imposed on the City simply because it employed Grace. However, the City cannot be held liable on a *respondeat superior* theory. *Monell v. Department of Soc. Serv.*, 436 U.S. 658, 691 (1978). There is no vicarious liability under § 1983. *Id.*

In his Complaint, plaintiff alleged that the City failed to properly train and supervise Officer Grace. However, plaintiff's motion is silent on this point. Likewise, plaintiff's motion fails to identify any custom, practice, usage, or policy of the City that had the force and effect of law that allegedly caused plaintiff's constitutional injury. Clearly, plaintiff's motion for summary judgment against the City must fail as it is not based upon the law.[2]

At the outset, plaintiff attempts to frame this case as having its roots in previous decades of racial injustice and poverty. Plaintiff even goes so far as to say that this case is not about an isolated incident that occurred in Pine Bluff, Arkansas on June 24, 1998. However, that is precisely what the case is about. Neither the City, nor Terry Wayne Grace, individually, can be held liable for alleged decades of racial injustice as perceived by the plaintiff. In an individual and official capacity § 1983 case, the plaintiff has to establish: (1) that the officer violated the plaintiff's constitutional rights in

---

[2] Defendants' brief in support of summary judgment contained a lengthy discussion of municipal liability, particularly failure to train and supervise. In order to not unnecessarily clutter the record, defendants will not repeat those arguments here, but instead, refer the Court to their own brief for a full discussion on this subject at pages 16-23.

2

connection with the incident in question and that he is not entitled to qualified immunity and (2) that the City has liability because it had an unconstitutional City policy so permanent and well settled as to constitute a custom or usage with the force of law. Nothing in § 1983 jurisprudence would allow the Court to impose liability on the defendants for this one incident based upon what the plaintiff alleges is "decades of racial injustice." Nor can the Court even view this case in that context.

Plaintiff states that for purposes of his motion, the Court should regard the factual allegations of Separate Defendant Terry Wayne Grace as true. While that statement initially sounds generous, even a cursory reading of plaintiff's brief and his statement of undisputed facts, quickly dispels any notion that plaintiff has set forth all of the relevant facts needed by the Court to make a determination of the issues. Indeed, plaintiff has engaged in a "pick and choose" strategy, selecting only those facts that bolster his argument and omitting relevant facts that support Officer Grace.

For instance, plaintiff states at p. 4 of his brief that "the first instance where Mr. Grace attempts to provide justification for his actions is on Page 13 of his deposition, where he testified that the Plaintiff's 'demeanor was threatening.'" Actually, Grace began explaining on page 12 of his deposition exactly what the plaintiff was doing that constituted obstructing governmental operations. Grace continued to explain for several pages, but plaintiff omitted Grace's explanation in his brief and instead chose only a very narrow portion of Grace's explanation to provide to the Court.

Grace's relevant testimony on this point is set forth below. While it is somewhat lengthy, it is important for the Court to see that Grace said much more than that he was concerned with Walker's attitude or that Walker had not "stepped to" as instructed. "Stepped to" refers to a two page argument advanced by plaintiff in his brief in which he claimed to anticipate a "last resort" argument from defendants on this point. While Walker's failure to move to a location where he

3

would be visible to Officer Grace while he conducted his traffic stop certainly played a part in his resulting arrest, it was not the only fact that Grace relied upon in arresting Walker. Additionally, simply because Walker was on a public street does not mean that he can stand him in the middle of or in any way interfere with an on-going traffic stop. (Exhibit No. 1, Grace Deposition Excerpts).

A:    He was hindering my governmental function that I was doing at the time and that was on a traffic stop, trying to conduct a traffic stop and he interfered with the safety of the officers and everybody there by his actions. (p. 12)

Q:    How did he do that?

A:    By his demeanor and his attitude and his stance and his excited attitude and stepping back and forth and his very loud speaking that brought people out of their residences because they could hear inside their house. I'm sure that's why people started coming out, they noticed a commotion and seen (sic) him stepping back and forth in very rapid motions, that he was very extremely close to it, the investigation traffic stop, which is a real dangerous situation by itself, just the traffic stop.

. . .

Q:    How would his being upset interfere with you in your governmental operations– (p. 13)

A:    Safety.

Q:    . . . And as I understand from your testimony, you didn't observe anything threatening to you or interfering with your governmental operations until you confronted Mr. Walker, is that correct? (p. 14)

A:    *No,* he was in the space of the traffic stop and he was causing a threat to me and the safety of the other officer and bystanders. I didn't know who he was or anything. He was a safety for himself and other officers. I did not know what he was capable of, he's a person out there, anybody is capable of anything and I did not know if he had weapons on him, his behavior, I could not–I could not conduct my traffic stop with my back turned to him, because I was not aware of what he was capable of.

Q:    Well, what did you understand that he was supposed to have said that was threatening or menacing? (p. 15)

4

A:     When I turned around and looked, after she brought my attention that he was there, and my attention turned away from my traffic stop, I turned around and I looked up and I said, "Sir, can I help you?" He said, "No." He said, "I'm here to watch you abuse black people."

. . . .

Q:     What did you respond to that?

A:     "Excuse me?" And I started walking over closer to him because by his demeanor and way he spoke, I could tell that he was upset, so I walked over closer to him and he stated it once again.

Q:     All right, and what did you say? (p. 16)

A:     I said, "Sir," I said, "Can you step over here to this side?" And I pointed toward the grass towards the edge of the roadway, he would be clearly visible to the officer and myself. I didn't mind him being there, I just didn't want him behind me and close to my unit, because my door was open on the passenger side and I had a loaded shotgun laying in the floorboard, for my personal protection on other calls, if the need comes to arise. And to me he was a threat at that time and I was conducting a traffic stop that was a possible felony traffic stop, which is a very–highly critical situation and he enhanced it that much more by being there.

Q:     And so it didn't bother you that he answered, according to your testimony, "I'm here to watch you abuse black people," that didn't bother you?

A:     No, but it just–a normal person doesn't make those kind of remarks and walk up in the middle of a traffic stop. I mean it just doesn't happen, it's not very often that people walk up and get in the middle of a governmental operation like that and walk up in the middle of a traffic stop, to make comments like that, unless they have intentions of doing something.

. . .

Q:     How did he interrupt that traffic stop?  (p. 17)

A:     By him being in the traffic stop and causing— and pulling my attention and my assisting officer's attention away from my traffic stop. If he would have remained at a safe distance or where he was in clear view, it would not have been a problem, but he chose to get behind me, where I cannot see him,

which led me to believe he had other things in mind, which I did not know, which becomes a threat to me.

. . .

Q:     What prompted you to pat him down and search him? (p. 21)

A:     There was a separate investigation started at that point in time because he was endangering the safety of Officer Sheets and myself and the other people that was involved. I felt like I needed to get him to where I could see him, get him away, so I asked him, I said— am I away from your question?

Q:     No, you go ahead.

A:     Okay. He was standing there in front of the grill of his vehicle and I pointed and I said, "Can you please step over here for me?" He said, "No," and he starts stepping the other way. Which in turn was further around behind and closer to the back of my unit, which is the way that just puts him more endangering myself and Officer Sheets' safety endangered.

Q:     You're facing him, he's standing in front of his grill and you pointed– (p. 23)

A:     I point to where he would be visible.

Q:     And you're pointing to your left? That's what you are doing here.

A:     When I'm facing him, yeah.

Q:     You're pointing to your left–

A:     So he would be visible. (p. 24)

Q:     –that would be toward the edge of the street?

A:     That would be toward the grass toward the side of the vehicle, where he would be visible to me.

Q:     . . . Now at what point in time did you ask him for his driver's license or identification? (p. 28)

A:     I never asked him for that.

Q:     Why not?

6

A:     Because he wasn't driving a vehicle.

Q:     Well, didn't you want to know who he was?

A:     No, it didn't make any difference.

Q:     It didn't matter to you who he was?

A:     No.

Q:     Did you ask him who he was?

A:     No.

Q:     Didn't care who he was?

A:     No.

. . .

Q:     Well, why did you proceed to immediately pat him down and put him in cuffs?  (p. 29)

A:     I didn't do it immediately.  I did it after I figured he wasn't going to calm down and he continued to get further and further into interrupting my safety and the other officer's safety.

. . .

Q:     . . . I'm trying to learn from you when you made up your mind you were going to arrest him?  (p. 31)

A:     I arrested him because of his demeanor and he kept walking to the right and would not do as I asked and continued to be just loud and behave in a very aggressive way, passive aggression, I guess you would call it.

Q:     And what was his demeanor, beyond what we've described here, that he responded to you and the stepping the wrong direction, you wanted him to go the other way and he stepped the wrong way, what was the other demeanor that he did that caused you to arrest him?

7

A:    Speaking in a threatening manner and walking in the wrong direction, causing a safety concern for the officer and myself and the people in the vehicles and I guess the people that was in his vehicle.

Q:    So that was the demeanor?

A:    Because I didn't know who all was in the vehicle that he came in.

Q:    That was the demeanor you arrested him for?

A:    That was the circumstances surrounding why he was arrested.

Plaintiff claims that none of Grace's reasoning for the plaintiff's arrest is "corroborated by anything tangible that a jury would have the ability to comprehend." (Plaintiff's Brief at p. 5). However, plaintiff ignores the corroborating testimony of Stephanie Sheets Smith, the other officer who was present at the scene. Excerpts of Deposition of Stephanie Sheets Smith, Exhibit No. 2:

Q:    You're the first one to address Mr. Walker, he had said nothing to you? (p. 25)

A:    When he got out of the car, like I said, he walked on up in there and had his arms crossed and the way he was standing, I didn't know what his intentions were. I had no idea, but what I was going to ask him to do was to move back, you know, because–my thing was, "Can I help you?" And the reason why I was asking him that was to see if he was related to these people and if he was involved, you know, emotionally in this stop, because he appeared to be frustrated and that's why I asked him, "May I help you?" . . . He looked aggressive and my deal was to keep, at least keep him here and watch him to make sure that, you know, Terry [Officer Grace] was all right. I can't confront him and watch Terry with four people and if something broke out with me and this man, who seemed very confrontational, then what if these four guys decided to jump Terry. . . .

Q:    Well, what was it that you were concerned about with Mr. Walker?

A:    His attitude.

. . .

8

Q:     Let's forget about putting in danger, you saw Mr. Walker violating a law, what was he doing that was violating the law?  (p. 37)

A:     He was interfering with me backing my–he was interfering with us, he was interfering with governmental operations.

Q:     And how was he doing that?

A:     By taking my attention away from this scene, having to split it up and watch him and that guy.

Q:     By standing at the scene with an attitude?

A:     By walking up and making me feel that there was a threat, yes, because I didn't know what he had in his mind.  Just because he don't (sic) have a gun in his hand don't (sic) mean he don't (sic) have one in his pocket.

. . .

Q:     We have reached a point that you have said you heard, "I'll sue you" and now you have responded to me that you heard Mr. Walker say, "If you touch me, I'll sue you."  Is that what you recall? (p. 45).

A:     When he was standing over there, he— Terry, like I said, is not facing me, he's facing me, and he said, "Don't. . . " to the best of my–he said, "Don't touch me."  And then he said, "I'll sue you, don't touch me."  And when he said— when he yelled, I looked that way and then I looked back at the gray car and then I looked back again and Officer Grace was patting him down and then he started yelling something about, "Consider yourself sued" and he just kept yelling stuff like that and people started gathering.  That's what I remember and I remember, I think he said something about being a lawyer, yeah, he said that he was a lawyer or an attorney or something like that. . . .

Plaintiff contends that Grace could have kept performing his traffic stop even with plaintiff standing there observing.  Defendants agree, as long as plaintiff had stood in a position where he was visible to the officer and a reasonable distance away from the traffic stop.  Officer Grace did not recognize John Walker and he testified that it did not matter to him who the plaintiff was.  Officer Grace was trying to make sure that he was safe, that Officer Sheets was safe, and that the four

9

gentlemen he stopped for a traffic violation were safe. As Grace testified, he did not know who Walker was or what he might be capable of doing. The plaintiff's presence, his strange remarks ("I'm here to watch you abuse black people") and his interruption of the traffic stop caused a valid safety concern. Officers on the street never know what to expect, so they must remain alert at all times for their safety and the safety of citizens around them.

There is no doubt that Grace had arguable, if not actual, probable cause for plaintiff's arrest. Therefore, Grace is entitled to qualified immunity for his actions in arresting Walker. At the time of Walker's arrest, there were no reported cases identifying exactly the type of conduct that would violate the statute for obstructing governmental operations. Grace's interpretation of the statute was reasonable. However, even if Grace had been mistaken, he would not lose his qualified immunity because of a reasonable mistake about the legality of his actions. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).[3] The qualified immunity doctrine accommodates for reasonable error because "officials should not err always on the side of caution because they fear being sued." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991).

### Conclusion

Plaintiff is not entitled to summary judgment on the issue of liability. Plaintiff raised no legal basis upon which the Court could impose liability upon the City and Officer Grace is entitled to qualified immunity for his actions. Accordingly, the Court should deny plaintiff's motion for summary judgment and instead enter judgment in favor of defendants.

---

[3]

Defendants included a full discussion of qualified immunity in their summary judgment brief. It would serve no purpose to repeat those arguments here. Therefore, the Court is referred to pages 6-15 of defendants' brief in support of motion for summary judgment.

Respectfully submitted,

Carol Billings
City Attorney
200 East Eighth Avenue, Suite 203
Pine Bluff, AR 71601
(870) 543-1805

By: _____

Patricia J. Hays No. 90006
Attorney at Law
2300 Andover Court, Suite 560
Little Rock, AR 72227
(501) 801-8200 telephone
(501) 801-7430 facsimile

## CERTIFICATE OF SERVICE

I, Patricia J. Hays, hereby certify that a true and correct copy of the foregoing was mailed, postage prepaid, to Ted Boswell, Boswell, Tucker and Brewster, P.O. Box 798, Bryant, AR 72089-0798, on this 20th day of February, 2004.

_____
Patricia J. Hays

11

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS

# Attachments to orginal Document in Court's Case File